BROWN et ux v. ECKHARDT et al.—129 S. W. (2d) 1122.

Middle Section. March 11, 1939.

Petition for Certiorari denied by Supreme Court, July 1, 1939.

Moreau P. Estes and Joseph J. Lutin, both of Nashville, for appellant.

W. Rufus Pardue, of Nashville, for appellee.

FAW, P. J.   This is a suit brought in the Chancery Court of Davidson County, Part Two, on November 22, 1935, by J. W. Brown and his wife, Louella Brown, as complainants, against Theodore W. Eck-

hardt and Edward E. Schiel, as defendants. All the parties are described in the pleadings as residents of Davidson County, Tennessee.

Complainant J. W. Brown died while the suit was pending, and before the hearing, in the Chancery Court, and, upon suggestion and admission of his death, his suit was dismissed, without objection, and the suit was thereafter prosecuted by Louella Brown, in her own right, as the sole complainant.

The Chancellor heard the case on the pleadings and oral testimony heard in open court, pursuant to a written agreement of the parties, filed in the cause, in conformity with the Act of 1917, Chapter 119, sec. 1, carried into the Code as Section 10564, and, on final hearing, the Chancellor dismissed the complainant's bill, at her cost; whereupon the complainant prayed, and was granted, an appeal to this Court, which she perfected by seasonably filing a bill of exceptions and the oath prescribed for poor persons. Assignments of error in her behalf have been filed in this Court.

The learned Special Chancellor filed an opinion below, which contains a statement of the issues made by the pleadings, and his findings of facts and conclusions of law, and, for reasons stated later herein, we here copy the Chancellor's opinion, in full, as follows:

"This is a suit to set aside a sale under a trust deed on certain property in Davidson County.

"The bill was filed on November 22, 1935, by J. W. Brown and his wife, Louella Brown, who owned the equitable title to the property prior to the sale, against Theo. W. Eckhardt the holder of the notes secured by said deed of trust, and purchaser at said sale, and Edward E. Schiel the holder of a first lien indebtedness on the property.

"The material averments of the bill are—

"That prior to the foreclosure, complainant Louella Brown was the owner of the property described in the bill on which were located four houses, grape arbors and vineyards, fruit and decorative trees, and other valuable improvements.

"Prior to Louella Brown becoming the owner of the property, J. W. Brown and Fred Brown purchased it from defendant Eckhardt for $6405.04, assuming an indebtedness of $3000.00 and executing monthly notes of $25.00 each except one which was for $30.04, secured by lien retained in deed of conveyance. At the date of sale, 112 of these notes had been paid aggregating $2800.00, leaving a balance of $605.04 principal and $48.00 interest, a total of $653.04 unpaid.

"After advertisement in a weekly newspaper in Nashville, the trustee, J. E. Johnson, under the terms of the installment deed, sold the property to the defendant Eckhardt for the sum of $500.00 and executed a deed, copy of which is exhibited with the bill. This deed discloses that the sale was for $500.00, subject to a first lien of $4000.-

'00 and accrued interest; certain taxes and fire insurance premiums paid by mortgagee, and constituting part of said debt, and all unpaid taxes. At this time the property was reasonably worth $17,000.-00, and $13,000.00 more than the first lien indebtedness, although acquired by defendant Eckhardt for the totally inadequate price of $500.00.

"Neither complainant attended the sale for the reason that defendant Eckhardt had told them that he would buy the property in and hold it for their benefit and allow them to redeem by paying him the amount due, of $653.04 by monthly payment notes of $25.00 each. After the sale was had, and in accordance with this agreement, complainants on February 9, 1934, paid said defendant $465.01 leaving a balance of $188.43, whereupon he repudiated said agreement and refused to accept the balance under the terms agreed upon.

"However, say complainants, without reference to said agreement they should be allowed to redeem said property by paying said sum of $653.04 according to the agreement, as the defendant will not be permitted to purchase said property under said circumstances and retain it for himself free from the claims and equities of the complainants, especially Louella Brown. And, this for the reason that said defendant, being the owner of the debt secured by the deed of trust and becoming a purchaser at the sale thereunder, holds the property as trustee for the benefit of complainants, by reason of this fiduciary relation. Wherefore, complainants are entitled to have the property resold for their benefit, paying defendant Eckhardt said balance of $188.44, or else may redeem the property by paying defendant said sum, though no tender is made.

"After the property had been conveyed to complainant Louella Brown, a new deed of trust was placed upon the property at the request of defendant Eckhardt, securing the sum of $4,000.00, $3,000.00 of which was used to discharge the first lien then existing, and the balance was applied according to an agreement of the parties. This $4,000.00 was a first lien at the time of the foreclosure sale.

"In addition to said agreement with complainants, defendant Eckhardt used other means to chill the sale under foreclosure, as a result of which only few persons were present and the property was sold under such circumstances that said defendant, and the trustee Johnson, knew that the property would not bring an adequate price, and the fact that it did not was the direct result of the wrongful acts of said parties.

"After becoming the purchaser under these conditions, the defendant Eckhardt sold part of the property on Virginia Avenue to one Cavender, receiving in payment therefor a certain farm alleged to be worth $7500.00, and transferred another part of the property to Irby S. Ridge for a consideration of $1375.00, a total consideration received by him of $8875.00 which, less the sum of $188.44 due de-

fendant, is owing complainants. The remaining portion of the property is claimed by complainants, presumably subject to the first lien indebtedness of $4,000.00, although the bill avers that it is not known whether anything is owing on that account.

"After receiving his deed, the defendant Eckhardt entered upon the property and committed waste to the extent of $2000.00 by cutting down shrubbery, the vineyard and arbors, and is also chargeable with a reasonable rent of $100.00 per month for the property during the time that he has been in possession.

"Complainants do not know the amount due defendant Schiel under the first lien indebtedness but he is called upon to show the correct status thereof.

"Defendant Eckhardt is insolvent, and the farm which he received in exchange for the houses on Virginia Avenue should stand in the place of that property, and he should be enjoined from making any disposition thereof.

"Such are the averments of the bill which then prays judgment for the amount due by defendant Eckhardt, including rental value, and an allowance for waste; that the foreclosure sale be set aside and the deed to said defendant cancelled; that an injunction issue restraining him from disposing of any of said property including said farm; that defendant Schiel show the amount due under his mortgage, and for general relief. The bill is sworn to by both complainants in person.

"Injunction, as prayed, was issued as to the remaining portion of the original property but not as to the farm.

"The answer of defendant Eckhardt is quite long and in considerable detail. Suffice it to say that the allegations of the bill are generally and specifically denied and the entire transaction is minutely explained. If the allegations of this answer are sustained by the proof, complainants are not entitled to any recovery.

"The defendant Schiel files an answer and cross-bill averring that the amount of his first lien indebtedness is $1500.00, and interest, and prays a foreclosure of the lien of the deed of trust. This indebtedness is admitted by the parties upon the hearing, and the cross-complainant states that immediate foreclosure is not insisted upon at this time under the cross-bill, although interest on the debt is past due.

"The facts are these:

"Proof is offered upon the hearing tending to show that complainant, Louella Brown, was of unsound mind at the time of the foreclosure, as well as before and thereafter, and the bill was amended to so aver. The purpose of this is not quite clear. The bill states that complainants had an agreement with defendant Eckhardt, prior to the sale, whereby he was to purchase the property for them and allow them to refinance their debt, and that thereafter Fred Brown un-

dertook to do this, but the defendant after taking $465.01 of their money, repudiated the agreement. The proof shows that no arrangements were had with Louella Brown concerning the property in question, but all negotiations were carried on by J. W. Brown and the son, Fred Brown. Complainants, nevertheless, resist efforts to show that Fred Brown, or J. W. Brown, acted as agents of Louella Brown.

"As far as complainants' rights are concerned, the primary question is whether the foreclosure sale was valid.

"Since the bill was filed, J. W. Brown has died and both the original and cross-bills are dismissed as to him.

"On February 1, 1923, defendant Eckhardt conveyed the premises in question to J. W. Brown and his son, Fred Brown, for a recited consideration of $6,410.04, Five Dollars cash; assumption of a first lien of $3,000.00, and the execution of 136 monthly notes, 135 for $25.00 each, and one, the last, for $30.04, more than eleven years being thus given within which to pay slightly more than half the consideration for the transfer. Eckhardt purchased the property unimproved, and furnished the Browns the money and materials to erect a house, outhouses and other improvements on part of the property on Maplewood Blvd., and after this the conveyance was made to them. The Browns, both being contractors and builders, did the work themselves and Eckhardt paid them therefor.

"It is proper to note at this time that prior to the foreclosure, the Browns, father and son, and defendant Eckhardt were on most friendly terms and had many business transactions together. It seems that the father and defendant continued these relations until the father's death, but the son, Fred Brown, became bitter toward Eckhardt shortly after the foreclosure and his testimony clearly reflects that attitude. His manner and demeanor on the witness stand gave evidence of positive hostility toward both the defendant and his solicitor.

"On November 12, 1924, J. W. Brown and Fred Brown conveyed the property to Mrs. Louella Brown, wife of J. W. Brown, the consideration being $5.00 cash and subject to prior encumbrances. This instrument states that the conveyance is to Louella Brown to her sole and separate use, etc., 'with remainder to her husband, J. W. Brown, his or their heirs and assigns.' The habendum clause contains a like provision, and in addition, there is this,

" 'It is expressly understood and agreed that the property herein described is conveyed to the said Louella Brown, wife of J. W. Brown, to her sole and separate use, estate, benefit, and behoof, free from the debts of her present, or any future husband with full power in the said Louella Brown to sell, mortgage, or otherwise dispose of same, during her natural life, without the joinder of any beneficiary, and with the remainder interest to said J. W. Brown.'

"Whenever an estate is given to a person generally or indefinitely, with an unlimited power of disposition annexed, it invariably vests the absolute fee in the first taker. The remainder to J. W. Brown is therefor (therefore) void. Magevney v. Karsch, 167 Tenn., 32, 56, 65 S. W. (2d), 562, 92 A. L. R., 343; Parker v. Milam, 166 Tenn., 266, 272, 61 S. W. (2d), 674; Bradley v. Carnes, 94 Tenn., 27, 27 S. W., 1007, 45 Am. St. Rep., 696.

"However, these provisions of this instrument are important with relation to complainants' insistences and will be further noticed.

"After complainants acquired the property they erected three small frame houses thereon fronting Virginia Avenue, and in rear of what is termed in the record, the large house located on Maplewood Boulevard. They also erected a small house on the rear of a fifty foot lot adjoining on Maplewood, and set out shrubs, fruit trees and grape arbors.

"Virginia Avenue was unimproved and was higher than the land on which these houses were built. A large open ditch ran between the street and the houses the entire length of the property. Ingress and egress was by bridges or platforms spanning the ditch. During rainy weather water would rise, or flow upon the lots as far as the houses. There were no other houses on this street and it appears from the evidence that it was a mistake to build in this location under the conditions shown to exist, as the property was enhanced in value only to the extent of the expenditures, if that much.

"In December 1931, complainants placed a deed of trust upon the property to B. R. Kennedy, trustee, securing defendant Schiel an indebtedness of $4,000.00. Defendant Eckhardt joined in this instrument, subordinating his lien thereto. The proceeds of this loan were used to take up the existing first lien debt of $3,000.00 and interest thereon; pay back taxes for three years and the expenses of the loan, and the balance of $453.31 was paid to J. W. Brown who in turn paid several of the notes held by defendant Eckhardt, this debt being several months in arrears at that time. The exact amount owing Eckhardt when this transaction occurred does not appear.

"On July 26, 1932, complainants executed a third deed of trust to Kennedy, trustee, securing 14 notes of $12.50 each payable to defendant Schiel.

"On June 20th, 1933, or about that time, the American National Bank, the holder of several notes which defendant Eckhardt had placed with them as collateral security for his indebtedness to the bank, delivered a number of them to said defendant's solicitor for collection. Complainant's notes were among the number. On the same day defendant's solicitor wrote to J. W. Brown and Fred Brown. Fred Brown denies receiving this letter, though it was properly addressed. The letter stated that the attorney held notes 108 to 136, payable to Eckhardt, dated February 1, 1923, and gave the amounts;

that many of them were past due; all bore interest from date, and provided for attorneys' fees; called attention to the first lien, unpaid taxes and insurance, and suggested settlement to avoid forclosure.

"Complainant's solicitor replied to this communication, suggesting that matters be held up pending efforts to procure a Government loan. Efforts were made in this direction but were apparently not successful. Defendant Eckhardt also made efforts on complainants' behalf to secure another loan to refinance the debt but was unsuccessful. Later, on September 29, 1933, defendants' solicitor again wrote J. W. and Fred Brown, advising that foreclosure proceedings had been started, enclosed a copy of the published advertisement, and called attention to the date of sale, October 21, 1933.

"There is no proof in the record to sustain any agreement between complainants and defendant Eckhardt, as alleged in the bill. The Court finds that no such agreement was had, and further, that no arrangement was made between the parties prior to the foreclosure, which would have affected the validity of the sale, if otherwise legally and properly conducted.

"After publication of the notice of sale and before sale was held, Fred Brown talked with both defendant Eckhardt and his solicitor and enquired as to the amount of the indebtedness. Nothing, however, was done or agreed upon. Fred Brown testifies that upon this occasion he was informed by Eckhardt that expenses amounted to about $700.00 which according to his calculation of the debt made a total debt and expenses of approximately $1400.00. He also says that he was sent to defendants' solicitor and was by him informed that his fees amounted to $150.00, whereupon he returned to Eckhardt's office and made an effort to settle matters but could accomplish nothing. He further states that he was prepared to arrange matters satisfactorily and could get the money required to pay the actual debt and proper fees and expenses, but that in view of these claims he refused to do anything. This is highly improbable and the explanation unsatisfactory. This witness undertakes to establish the agreement set up in the bill and to show that such an arrangement was had. The bill avers that at the time of foreclosure Eckhardt's principal debt was $605.04 and interest had accrued of $48.00. The agreement is calculated upon this theory, although obviously incorrect. The letters from defendants' solicitor show the amount of principal notes unpaid, the date of the notes and that interest runs from date. The witness must have known that the debt was much greater. As a matter of fact the actual debt, principal and interest, was $983.63, and defendant Eckhardt had paid interest on the first lien debt of $120.00 and taxes were unpaid amounting to $193.22. The expense of foreclosure amounted to $64.00.

"The sale was held as advertised, on October 21, 1933, and was in all respects in conformity with the provisions of the installment

deed and the publication notice. A number of other sales were held at the same time and place and a large number of persons were in attendance. There were present at the particular sale, both defendants, the trustee Johnson, defendants' attorney and others. Defendant Eckhardt was the only bidder and the property was struck off to him by the trustee at his bid of $500.00. Defendant Schiel made no offer for the property but was present to protect both his first and third liens and was prepared to bid an amount sufficient for that purpose. His reason for not bidding was that defendant Eckhardt agreed that if he became the purchaser he would pay off the third mortgage debt. The sale was subject to the first lien of $4000.00 and interest, and unpaid taxes. Defendant Eckhardt testifies that he made no personal efforts to obtain bidders other than to have the publication made. He further states that, after the sale he considered the property his own, and intended to dispose of it and retain any profit that might accrue. This he says was the custom in Nashville.

"Notice of this sale was published in the Labor Advocate, a weekly newspaper in Nashville, and a copy of the issue of October 12th, 1933 is placed in evidence. It appears that seven other sales were advertised in this paper alone for the time and place of the one in question. Further, that a total of 95 foreclosure sales were advertised in this issue of the paper, as well as 3 chancery sales, and it contained 25 other legal notices of various kinds. It is not insisted that this publication was not a proper medium for the advertisement of such sales, and considering the foregoing facts, it is only reasonable to assume that anyone interested in such matters would likely have consulted such a source of information.

"There is no evidence that any effort was made to keep bidders from the sale, and none as to what efforts the trustee Johnson made to procure the presence of such. Complainants and their son Fred Brown made no efforts in this connection and none of them were in attendance. Their failure to manifest any interest is not explained by their claim of an agreement with the defendant Eckhardt to buy the property for them. This is wholly unsupported by the proof.

"Defendants' attorney notified complainant J. W. Brown and his son Fred Brown, by letter, and gave them full particulars and enclosed a copy of the notice of sale. Fred Brown talked with the defendant Eckhardt and his attorney before the sale, and knew or should have known the facts as to the indebtedness on the property, and other particulars. No objection to the sale seems to have been made until late in 1935, shortly before the bill in the cause was filed, and after defendant Eckhardt had foreclosed upon other property of complainants. The record indicates that J. W. Brown continued his friendly relations with defendant Eckhardt until the bill was filed.

"Counsel for complainant insist that complainant Louella Brown

knew nothing of the sale or what transpired either before or thereafter, and was not in fact notified thereof by defendant. But, that in any event, she was a person of unsound mind at the time, and was incapable of transacting any business or looking after her own affairs. Some testimony to this effect was offered and was admitted by the Court on the theory that it was competent to explain her failure to testify as a witness, or to attend the sale, and in connection with complainants' charges of illegality of the sale. It is probable that this complainant was not in good health at the time of the sale, and there is testimony that she was not at the time of the trial.

"The record further discloses that the reason defendant Eckhardt agreed to pay the third lien indebtedness held by defendant Schiel, should he become the purchaser at the foreclosure sale, was because complainants were in default on the first lien debt and Schiel had notified Eckhardt that he was going to foreclose the first mortgage unless this was remedied. That, consequently Eckhardt paid one interest note of $120.00 and then when it was realized that complainants could not refinance their loans he started foreclosure of his own lien and made the agreement. This is probable. Had the first lien been foreclosed, commissions, fees and expenses would have been much greater than was necessary to be paid in satisfaction of the third mortgage, and Eckhardt would be burdened with this in order to protect his debt. Further, the first mortgage would have been satisfied by the sale, and the debt would have to be refinanced at further expense. It was no doubt because of these conditions that the agreement was made. It does not appear that it affected the sale in any way.

"Upon the hearing defendant amended his answer to allow complainants credit for the full amount of his debt of $1046.53 instead of the amount bid at the sale of $500.00. No deficiency therefore exists.

"At the time of the sale the first mortgage amounted to $4,000.00, $2500.00 of which has since been paid. Eckhardt had paid interest thereon of $120.00 on June 5th immediately preceding. Taxes were due and unpaid for 1932 and 1933 amounting to $193.22, and on December 12th defendant paid another interest note of $120.00; the third lien debt of $112.50; expense of repairs made by Schiel $28.60, and insurance premiums which had been paid by him amounting to $106.24. These items total $5728.19.

"Complainants' solicitors insist that in arriving at what Eckhardt paid on account of the property, the Court should consider only what was assumed or actually paid at the sale and the interest paid by Eckhardt on June 5th; the amount paid on the third mortgage, and the sums subsequently paid Schiel, should not be taken into consideration. This is a Court of Equity. The contention is obviously unsound.

"It is charged that the amount bid for the property by de-

fendant Eckhardt was inadequate, and complainants' solicitors insist that this question must be determined from the relation of the amount of the bid of $500.00 to the supposed value of the equity, as that was what was sold under the foreclosure. This is ingenious but not sound. The inadequacy, if any, must be determined on the basis of the real value of the land at the time of the sale and its relation to the total debt against the property in Eckhardt's hands as purchaser, including the first lien indebtedness, unpaid taxes; interest; other amounts properly expended by Schiel under the first mortgage in protecting the property, and the other amounts paid by Eckhardt as above stated, as well as the amount bid by him at the sale and the balance of his debt for which credit was allowed by amendment upon the hearing. See Erwin National Bank v. Riddle, 18 Tenn. App., 561, 79 S. W. (2d), 1032.

"The bill avers that at the time of the sale the property was reasonably worth $17,000.00, or $13,000.00 more than the first lien indebtedness subject to which the sale was made. Fred Brown so testifies, and further states that defendant Eckhardt cut down or destroyed vineyards, shrubs and trees of great value after he took possession of the property.

"Two contractors testify as to the value of the property for complainant. A. R. Harvey examined the property in 1935 and states in his opinion it was worth $17,750.00. He values the large house on Maplewood at $6,000.00 and the land at $1500.00; the small house on Maplewood at $1750.00; the three houses on Virginia at $2400.00 each and the lots $400.00 each; the vacant lot on Virginia at $800.00 and a grape arbor at $500.00.

"L. L. Tomlinson places the value of the entire property at $16,300.00—the large house and lands at $7500.00; Small house on Maplewood at $1600.00; one house and lot on Virginia at $2400.00 and the other two at $2200.00 each, and the vacant lot and grape arbor on Virginia at $800.00. This witness thought all houses had city water, and that large house was equipped with bath. He valued the land along on Maplewood at $25.00 per front foot, or $5,000.00 and that on Virginia at $10.00 per foot or $2,000.00.

"J. D. White bought a farm from defendant Eckhardt for $5500.00, to cover which he executed his notes for $5,000.00 and gave Eckhardt an automobile valued at $500.00. He kept the farm for a short time and sold it to G. P. Cavender in 1930 for $6,000.00. Cavender in 1935 traded this farm back to Eckhardt for the three houses and the vacant lot on Virginia Ave.

"From August 7th, 1934 to September 11, 1935, defendant Eckhardt collected gross rentals of $411.50 from all the property. The record does not disclose the amount of rent received by complainants from the date of foreclosure until possession of the property was surrendered in August 1934.

"For the defendants, a number of real estate agents and appraisers testify as to the value of the property.

"C. B. Criddle, appraiser for the Commerce-Union Bank, and a real estate agent, examined the property in January 1936. He placed the total value of all the property at that time, at $7,560.00.

"J. M. Whitsitt, a real estate man of considerable experience, made an appraisal on December 4, 1935, and placed a value on all the property of $8,000.00.

"Goodloe Cockrill, a real estate man and an appraiser of many years experience, placed a value upon all the property of between $7,550.00 and $8,000.00.

"Louis Wrenne, an experienced agent, stated the property was worth $7,450.00. His appraisal was made January 31, 1936.

"Ed Horn, another competent agent, thought the property worth $7,350.00. His appraisal was made January 20, 1936.

"All of these agents stated that property was worth about the same when they examined it as it was in October 1933, or else slightly more. All of them have had many years experience in buying, selling and appraising real estate and appear to be familiar with values generally, and in the immediate neighborhood.

"C. C. Cloyd and H. T. Vance testified as to the value of the Cavender farm. The former fixed the reasonable value thereof at $2,845.00, and the latter $2,520.00. W. H. Majors fixed the value at $2,375.00. All of these are real estate men of experience and are particularly familiar with farm values.

"In November 1935, defendant sold the small house on Maplewood to one Ridge for $1,375.00, $100.00 cash, and 80 notes, all for $16.00 each, except the last for $11.00.

"After Eckhardt acquired the property and prior to the time these appraisals were made, he expended $1,125.30 in repairs and improvements on the property; paid small amounts in connection with the Cavender and Ridge transactions, and also taxes for 1934 of $103.16, and additional interest on the first lien indebtedness.

"The amount of these repairs and improvements, and the amounts originally expended by Eckhardt of $5,728.19, aggregate $6,853.49.

"In 1935 Eckhardt attempted to place a loan on this property for J. W. Brown, and applied to the Commerce-Union Bank. Chas. F. Lovell appraised the property, valued it at $6,000.00, and agreed to make a loan of $3,000.00. Then an effort was made to have W. H. Cox, Jr., make a second loan of $1,000.00. He refused when he learned that it was sought for J. W. Brown. This witness also made an appraisal of the entire property in January 1936, and placed a total value thereon of $7,700.00. He also thought the property worth slightly more in 1936 than in October, 1933.

"Upon the whole record the Court is of opinion that at the time of the appraisals in 1936 the entire property was reasonably worth

$7,500.00, and at the time of the foreclosure sale about $6,000.00, and not over $6,500.00. It is not likely that it could have been sold at these figures due to conditions existing in 1933, as shown by the record and with which the Court is familiar.

"There is no such inadequacy here as to justify setting aside the foreclosure sale. Mitchell v. Sherrell, 11 Tenn. App., 210; Doty v. Federal Land Bank, 169 Tenn., 496, 90 S. W. (2d), 527, 89 S. W. (2d), 337; Union Joint Stock Land Bank v. Knox County, 20 Tenn. App., 273, 97 S. W. (2d), 842.

"The record discloses no fraud in connection with the sale, and there were no irregularities in the proceedings. The sale was properly advertised and fairly held.

"Complainants' solicitors submit a number of authorities to sustain their contention that the sale should be set aside because of the inadequacy of price and conditions surrounding the sale. They are clearly to be distinguished from the case at bar upon their facts. Most of them are referred to in Mitchell v. Sherrell, and Doty v. Federal Land Bank, supra. They need not be considered here.

"Complainants also insist that the mere fact that defendant Eckhardt became the purchaser at the sale is sufficient to set the sale aside since he was the holder of the debt secured by the deed of trust. This on the theory that under these circumstances he became a quasi trustee for complainants and must account for the actual value of the land, not being authorized to bid at the sale. The Court is referred to Chester v. Greer, 24 Tenn. (5 Humph.), 26, 36, and a number of other old cases, principally, Coffee, et al. v. Ruffin et al., 44 Tenn. (4 Cold.), 487, 488, in which most of the other cases are mentioned. It is only necessary to say that in these cases it does not appear that the holders of the debts were authorized by the mortgages or deeds of trust to bid at the sales. It was no doubt to meet the holding of these and other similar cases that clauses were inserted in mortgages and deeds of trust allowing mortgagees and holders of debts secured by trust deeds to bid and become purchasers at sales held under the instruments.

"The installment deed from Eckhardt to J. W. and Fred Brown under which the foreclosure was held in the case at bar, provides that 'The creditor may bid at any sale under this trust conveyance.' This is a valid provision and a complete answer to this insistence. Mitchell v. Sherrell, supra.

"It is probably proper, though not necessary to notice certain other matters in the record.

"On March 29th, 1934, J. W. Brown certified that Louella Brown was an insane person. Dr. J. P. Gilbert made a similar certificate and J. R. Allen, a justice of the peace accordingly certified to the County Board of Commissioners that he had held an inquest and was satisfied that she was insane. On the same day the Chairman of this

Board directed the Superintendent of the County Asylum to receive the applicant Louella Brown subject to the Board's action at the next meeting, as she could not wait until that time. She was discharged from this institution April 15, 1934 and thereafter in the same month admitted to the Central State Hospital for the Insane. She was paroled from this institution in August 1934, and discharged in September 1935.

"Dr. Gilbert testifies that Mrs. Brown was insane at the time he examined her in March 1934, and Dr. Farmer states that she was admitted to the State Hospital on account of mental troubles and was treated therefor. Another doctor, Roger Burroughs, testifies that he examined this party on October 29, 1933 and again on November 5th, and found that she was suffering from lobar pneumonia. He examined her again in the early part of 1934 and found her insane and thought that her condition had existed for as long as six to twelve months. He did not discover it however when he examined her in October and November 1933.

"The record does not disclose that there has ever been an adjudication of insanity. Mrs. Brown signs and swears to the bill filed in this cause and it is not insisted that she is insane at this time, or that she was when she signed the bill. There is no convincing or sufficient proof that she was insane at the time of the foreclosure or when any of the transactions in this cause occurred.

"There is a presumption that after March 29, 1934 Mrs. Brown was insane. She was paroled in August however and completely discharged in September, 1935. Puryear v. Reese, 6 Cold., 21.

"Where however only occasional fits of insanity are shown, then the presumption is that a particular act was performed in a sane interval. Bryant v. Jackson, 6 Humph., 199.

"Where there is an adjudication of insanity it is conclusive from that date, but only prima facie evidence from any prior date since when the jury may find it to have existed. Pritchett v. Plater, 144 Tenn., 406, 423, 232 S. W., 961.

"The bill was originally filed upon the theory that J. W. Brown and Fred Brown were authorized to act for Louella Brown as the owner of the property and represented her in their negotiations with defendant Eckhardt, as the proof clearly shows that Mrs. Brown had no transaction personally with Eckhardt, and J. W. Brown handled and looked after the property. Complainant seeks to change this position upon the hearing, the bill is amended, and proof is offered of insanity. It was admitted only for the purposes heretofore indicated.

"After the sale and on December 12, 1933, defendant Eckhardt procured a detainer warrant to obtain possession of the property and on which a judgment was entered December 18th. No appeal was.

taken. Before and after this judgment J. W. Brown and Fred Brown had talked with Eckhardt and tried to arrange some settlement of the indebtedness and obtain title to the property. Fred Brown agreed to pay the debt upon reconveyance of the land and the defendant upon the strength of this agreement offered to do so. It was for that reason that possession was not taken of the property. Furthermore, defendant after having previously notified the tenants not to pay further rent to Brown, went with him and instructed them to continue their payments as theretofore as a result of the promise of both J. W. and Fred Brown to arrange settlement of the indebtedness. Complainants thereafter collected the rent until August 1934 and retained them, but did not make any payment either to Eckhardt or on the first lien indebtedness. Defendant, on account of his friendship and long association, was more than willing for complainants to reacquire their property and endeavor to help them refinance the debt.

"On July 12th, 1934, J. W. Brown wrote defendant Eckhardt the following letter:

" 'After carefully thinking the matter over in regard to my property in Maplewood, and being unable to refinance same, I have decided to turn the property over to you.

" 'You can go out to the property and talk with the tenants, and make arrangements to collect the rent from them, and I will give you possession of the entire property including the house that I live in, in the next few days.

" 'Thanking you very much for the kindness you have shown me in this matter, and with best regards, I remain,'

"Thereupon defendant Eckhardt took possession and began to collect the rents and make repairs and improvements on the property.

"It should be noted here that J. W. Brown represents himself as the owner of the property. He had all negotiations with Eckhardt, other than those conducted by his son. And, though the remainder interest in his favor created in the deed to Louella Brown was void by reason of the unlimited power of disposition given therein, yet that instrument clearly shows that J. W. Brown intended to retain an interest in the property and thought he had done so. Furthermore Mrs. Brown paid nothing for the property when she acquired it and expended nothing thereon after that time. All improvements were made by her husband. Fred Brown testifies that he transferred his property to his wife so that creditors could not reach it. J. W. Brown evidently considered that he had parted with his (interest) only on paper.

"It would be grossly inequitable upon the foregoing facts to allow Louella Brown to recover in this cause by reason of this charge of insanity coupled with the other facts and circumstances. It is conceded upon the hearing that even if she had been insane, that fact would not have prevented a foreclosure.

"In support of the agreement alleged in the bill, Fred Brown testifies that at the time the sum of $465.01 was paid, it was to apply on the indebtedness on this property, leaving a balance due Eckhardt of $188.43. This is not supported by the proof and the Court finds that the payment was made on another indebtedness.

"The original bill will be dismissed at complainant's cost.

"Action on the cross-bill, and taxation of costs incident thereto, is reserved for further orders.

"Decree accordingly,

"James A. Newman,
"Special Chancellor."

In accord with the aforesaid findings and opinion of the Chancellor, a decree was entered, as before stated, dismissing complainant's bill at her cost, and, by her appeal from that decree, the complainant has brought the case to this Court and has filed assignments of error numbered one to thirteen, inclusive.

█ Some of appellant's assignments are merely matters of argument, and not true assignments of error, in that, they do not challenge as erroneous any *affirmative ruling or rulings* of the Chancellor, but assert that the Chancellor erred in *"not holding"* in conformity with certain propositions stated in said assignments respectively, see Oliver v. Marbut, Tenn. App., 123 S. W. (2d), 859, 862.

The assignments of error are of considerable length (covering approximately four typewritten pages) and we think it sufficient for present purposes to state their substance which, as we understand them, is (in addition to the general assignments that there is no evidence to support the judgment of the Court, and that the evidence preponderates against the judgment of the Court) as follows:

1. The Court erred in holding that the foreclosure sale was fairly conducted and was not illegal and invalid for any of the reasons alleged by complainant.

2. The Court erred in holding that the value of the entire property at the time of the foreclosure sale was approximately $6,000, and that the present value thereof is $7,500.

3. "The Court erred in not finding the additional . facts as requested by the complainant, as shown by the request for additional findings filed in the case."

The contentions of appellant, which are interwoven with her assignments of error and urged by learned counsel on the brief in her behalf, are, in substance and effect, as follows:

(a) That the price paid by defendant Eckhardt at the foreclosure sale was "grossly inadequate," in that, the property was, at that time, worth approximately $15,000, and that, after deducting the first mortgage debt, the complainant's "equity" therein was worth approximately $10,000, for which the defendant bid and paid only $500.

(b)   That the relation of defendant Eckhardt, as mortgagee, to complainant, as mortgagor, was a trust or fiduciary one, and that the burden was on him (Eckhardt) to show, not merely by a preponderance of evidence but, ''by clear and satisfactory proof'' that the foreclosure sale was properly and fairly advertised and conducted, and that the property brought an adequate price, which burden was not discharged by defendant Eckhardt.

(c)   ''That the complainant at the time of the sale was an insane person, unable to be present at the sale, and that her husband was a drunkard, both of which facts were known to the defendant.''

(d)   ''That the defendant made no effort to secure purchasers or have a sale where the fair value of the interest of complainant in the property could be had,'' but undertook to, and did, ''buy it in at the lowest price with the idea of reselling it at a higher price and keeping the profit;'' and that defendant's agreement with Schiel to pay Schiel's third mortgage debt of $112.50 if Schiel would not bid on the property, was intended, and operated, to ''chill'' the sale, and was a fraud on complainant.

After a careful examination and consideration of the entire record, including the assignments of error and briefs of counsel for both parties, we are of the opinion that the material and determinative facts of the case are sufficiently and correctly stated in the Chancellor's opinion hereinbefore copied, and we concur therein.

We also concur in the Chancellor's opinion with respect to the law applicable to the facts thus found, and we adopt the Chancellor's opinion.   There is, therefore, no occasion for us to re-state the facts.

■ ■   It is insisted for appellant that Eckhardt, after his purchase at the sale by the trustee, Johnson, held the property in question as trustee for the appellant, because of the fact that he was a creditor secured by the trust conveyance—that his relation to the original trustors, and to their grantee (the appellant) was a fiduciary one, and that he could not lawfully become the purchaser, for his own benefit, at the sale by the trustee.

The principal authority upon which appellant relies for support of the proposition just stated, is the opinion in Wade v. Harper, 3 Yerg., 383, wherein the Court said (as summarized in the Headnote to Cooper's Edition) the rule is that ''where a deed of trust of real and personal property is made to secure a debt, with authority in the trustee, on the debtor's default, to sell at the request of the beneficiary, for ready money or on a credit at the option of the said beneficiary, the latter occupies such a relation to the transaction that if he buy in the property, at the trust sale, the debtor may still treat the same as subject to the trust, however fair the purchase may have been.''

But in the later case of Lyon v. Jones, 6 Humph., 533, 534-535, it was held that ''the mortgagee or creditor in a deed of trust may pur-

chase at a trust-sale if he acts with fairness in the transaction, and his title will be good.''

In Lyon v. Jones, supra, the Court said:

''The relation in which the mortgagee or creditor in a deed of trust stands to the vendor or debtor, imposes upon him the observance of fairness and good faith; and if he make an improper use of the power which he has over the trustee and over the sale, and become the purchaser, he will be held, in equity, as entitled to retain the property only as a security for his debt. The general ground on which his honor, the Chancellor, placed his decree, namely, that the mortgagee or creditor in a deed of trust will not be allowed to purchase at all at the trust sale, cannot be maintained. .In general, his power over the sale is not greater than that of an execution creditor over a sale at law, whose right to purchase has never been questioned. The wrongful and injurious exercise of this power, in either case, against fairness and good faith, will deprive the party, in equity, if a purchaser, of an advantage fraudulently obtained.

''The general principle recognized in the case of Wade v. Harper, 3 Yerg. [383], 384, is applicable to sales and purchases by trustees, and the authority relied on is that of Armstrong's Heirs v.. Campbell [3 Yerg. 201], and that class of cases. The case, under all its circumstances, may have been properly decided, but it confounds or mis-states the relation of parties, and seems not to have been well considered. What is said on the same subject in Chester v. Greer, 5 Humph. [26], relates to the misconduct and wrongful and injurious acts of the creditor in the deed of trust.

''The mortgagee or creditor in a deed of trust may purchase at a trust sale if he acts with fairness in the transaction, and his title will be good. In so holding, we overrule no decision made upon a state of facts involving such a question; we merely dissent from the correctness of what seem to be dicta in the cases referred to.''

The holding in Lyon v. Jones, as above quoted, has been since followed in this State. See Coffee v. Ruffin, 4 Cold., 487, 488, 513-515; Bill Jones Auto Co. v. Carr & Co., 4 Tenn. App., 443, 446; Mitchell v. Sherrell, 11 Tenn. App., 210, 219-221; Hawkins v. Spicer, 20 Tenn. App., 528, 531, 101 S. W. (2d), 151, 153.

And the rule has been extended to a trustee or mortgagee. In Hawkins v. Spicer, supra, it is said:

''A trustee or mortgagee may· bid at his own sale. While in most states the mortgagee or trustee in a mortgage or deed of trust which contains a power of sale on default cannot become the purchaser at a sale which he himself, makes under the power, either directly or through the agency of a third person. Tennessee is an exception to this rule, and a trustee may purchase at the trust sale, but his relations to the mortgagor or debtor impose upon him the observance of fairness and good faith, and if he makes an improper use of the power

and becomes the purchaser, he can retain the property only as security for his debt. 41 C. J., 978, 979; 1026, sec. 1490; Jones Auto Co. v. Carr & Co., 4 Tenn. App., 443, 446, 447; Lyon v. Jones, 6 Humph. 533.''

In the instant case, Eckhardt was not the ''trustee or mortgagee,'' but was the holder of the debt secured by the conveyance to Johnson, Trustee, and the trust instrument provided that the holder of the debt might bid for and buy the property at the sale by the trustee. In 3 Jones on Mortgages (8 Ed. 1928), sec. 2425, it is said:

''A provision in express terms that the mortgagee may purchase is usually found in the mortgage deed where power of sale mortgages are in general use, and there. is no statute authorizing the mortgagee to purchase at his sale under the power. It has sometimes been declared that this privilege should be strictly construed and should not be favored; but it is generally held that under such a provision the court will not interfere with a purchase by the mortgagee unless there be some other objection which would invalidate a purchase by any one else under the same circumstances.

''All that is required to make the purchase by a mortgagee valid and binding is that the sale be in all respects fairly and faithfully conducted. The right of the mortgagee to purchase under such a provision is fully sustained by the courts. Lord Eldon clearly intimates that under such authority a trustee might become a purchaser of the trust property; and a mortgagee is not a mere trustee, but has interests of his own to protect.

''If the mortgagee avails himself of his right to purchase under a provision in the power giving him this privilege, he will be held by a court of equity to the strictest good faith and the utmost diligence in the execution of the power for the protection of the rights of the mortgagor, and his failure in either particular will give occasion to allow the mortgagor to redeem. The mere fact that the land did not sell for its full value is not alone sufficient to establish fraud or unfairness in the mortgagee. A stipulation in a power of sale in a mortgage authorizing the mortgagee to purchase at his own sale is a part of the security, and passes to an assignee of the mortgage.''

And in section 2406 of the same volume it is said that, ''If no one but the owner of the note bids at a sale, his offer, in the sense of the term as used in the trust deed, is the highest and best bid.'' See also Hawkins v. Spicer, supra, 20 Tenn. App., at page 531, 101 S. W. (2d), at page 151.

Upon the facts found by the Chancellor, which we think supported by the record, we are of the opinion that the sale involved in this case was fair and without fraud, and that the ''equity'' of the appellant in the property brought an adequate price, when the encumbrances thereon and the concessions made by the appellee (as in Erwin National Bank v. Riddle, 18 Tenn. App., 561, 576, 79 S. W.

236

(2d), 1032) are considered. Moreover, if there had been mere inadequacy of price, but the sale was, as we hold, otherwise free from fraud or oppression, such inadequacy would not be a ground for setting aside the sale. Doty v. Federal Land Bank, 169 Tenn., 496, 505, 89 S. W. (2d), 337, 90 S. W. (2d), 527.

It results that appellant's assignments of error are overruled, and the decree of the Chancery Court dismissing the complainant's bill, at her cost, is affirmed, and a decree will be entered here accordingly.

The costs of the appeal will be adjudged against the appellant, Mrs. Louella Brown.

Crownover and Felts, JJ., concur.